UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>v.<br><br>APPROXIMATELY $50,205.00 IN UNITED STATES CURRENCY, et al.,<br><br>         Defendants. | Case No. 12-CV-1183-JPS<br><br>ORDER |

1. Background

The United States of America brings this civil forfeiture action *in rem* based on allegations that the defendant properties[1] constitute, *inter alia,* proceeds traceable to knowing and intentional exchange(s) for controlled substances, analogs thereof, or both, all in violation of 21 U.S.C. §§ 841(a)(1), 813 and 802(32), and, therefore, are subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6). (Docket #104, ¶¶ 5 and 19).[2]

In response to the United States' third amended verified complaint, claimants of interests in the defendant properties – John Wilhoite, Amy Wilhoite, 6 Degrees Marketing Group, Synergy Botanicals Co., LLC, Brothers Wholesale, Purity Brokers, Alec Nicholas Consulting, Christopher Brett Hinton, J&B Packaging LLC, JV Imports LLC, Yi Zhou, Hong Yong Zou, and

---

[1] A full list of the defendant properties in Section 2.1 of this Order.

[2] This theory appears to account for thirty-four of the thirty-five defendant properties; as to the remaining property – one 2005 Infiniti FX35 – the United States alleges that it was used to facilitate the knowing and intentional transportation or concealment of materials intended for use in the knowing and intentional trafficking of controlled substances, analogs thereof, or both, all in violation of 21 U.S.C. §§ 841(a)(1), 813 and 802(32) and therefore is subject to forfeiture to the United States under 21 U.S.C. § 881(a)(4). *See* (Docket #104, ¶¶ 5 and 20) and (Docket #104, Exhibit A, ¶¶ 67-69).

Jia Zou (collectively, "Claimants") – move to dismiss the complaint against the defendant properties on three grounds: (1) *mens rea* for the alleged predicate offenses is not adequately alleged through specific factual allegations to state a claim upon which relief may be granted; (2) nexuses between the alleged predicate offense(s) and the defendant properties are not adequately alleged through specific factual allegations to state a claim upon which relief may be granted; and (3) the Federal Analogue Act is unconstitutionally vague as-applied to the chemicals underlying the alleged predicate offenses. *See* (Docket #s 111, 120, 121 and 122).

For the reasons set forth below, the Court is obliged to deny Claimants' motions to dismiss.

2. The United States' Statement of the Case

   2.1 The Defendant Properties

Following is a list of the defendant properties in this case: (A) approximately $50,205.00 in United States currency; (B) one 2008 Hummer H2 bearing vehicle identification number (VIN) 5GRGN23898H102440; (C) one 2005 Infiniti FX35 bearing vehicle identification number (VIN) JNRAS08U65X103279; (D) one Colt AR-15 Carbine rifle; (E) one Draco-C pistol; (F) one Aimpoint Comp M4s rifle optic; (G) one iTac defense weapon mounted tactical light/laser; (H) one magnifier for rifle optics; (I) approximately $137,132.07 in United States currency from JPMorgan Chase Bank N.A. account ending in 9124; (J) approximately $44,307.54 in United States currency from JPMorgan Chase Bank N.A. account ending in 9132; (K) approximately $218,816.79 in United States currency from a cashier's check originating from Wells Fargo Bank account ending in 1880; (L) approximately $242,675.69 in United States currency from a cashier's check originating from Wells Fargo Bank accounts ending in 8782 and 2333; (M) approximately

$10,000.00 in United States currency from a cashier's check originating from East West Bank account ending in 0778; (N) approximately $10,000.00 in United States currency from a cashier's check originating from East West Bank account ending in 0885; (O) approximately $50,000.00 in United States currency from a cashier's check originating from East West Bank account ending in 0828; (P) approximately $181,812.70 in United States currency from Bank of America account ending in 2345; (Q) approximately $45,003.17 in United States currency from Bank of America account ending in 2329; (R) approximately $21,105.37 in United States currency from East West Bank account ending in 0778; (S) approximately $126,538.63 in United States currency from East West Bank account ending in 0828; (T) approximately $13,314.64 in United States currency from East West bank account ending in 0869; (U) approximately $53,103.25 in United States currency from MetroBank account ending in 8965; (V) approximately $36,346.90 in United States currency from Wells Fargo Bank account ending in 6316; (W) approximately $70,403.61 in United States currency from Wells Fargo Bank account ending in 4256; (X) approximately $154,696.20 in United States currency from Wells Fargo Bank account ending in 9755; (Y) approximately $4,512.51 in United States currency from Wells Fargo Bank account ending in 8653; (Z) approximately $12,535.48 in United States currency from Wells Fargo Bank account ending in 1416; (AA) approximately $36,053.52 in United States currency from Wells Fargo Bank account ending in 1600; (BB) approximately $19,326.61 in United States currency from Wells Fargo Bank account ending in 5873; (CC) two DBF900 horizontal continuous band sealers; (DD) approximately 18,978 pounds of damiana leaves; (EE) one Chicago electric chipper shredder 66910; (FF) one 2009 Syntron F-TO-C magnetic feeder with serial number GPMF49856; (GG) approximately 3,425

pounds of damiana leaves; (HH) approximately $65,027.00 in United States currency; and (II) assorted jewelry identified as one 18-carat white gold ladies Breguet Reine de Naples watch and one 18-carat white gold diamond pendant.

### 2.2 Summary of the United States' Factual Allegations

To contextual the legal analysis set forth below in Section 3, the Court will briefly summarize the United States' statement of the case.[3] Because Claimants move to dismiss the complaint for failure to state a claim, the United States' allegations are entitled to due deference: "[a]ll well-pleaded facts are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor." *Hale v. Victor Chu*, 614 F.3d 741, 744 (7th Cir. 2010).[4]

### 2.2.1 The Organization

Between approximately March 1, 2011, and September 19, 2012, Claimants (with the exception of JV Imports LLC)[5] and others[6] conspired to

---

[3] The verifying affidavit of Ann Marie Phillippi – "a Federally Deputized Task Force Agent" "assigned to the United States Department of Justice, Drug Enforcement Administration (DEA)" (Docket #104, Exhibit A, ¶ 1) – is incorporated into the complaint by reference. (Docket #104, ¶ 5).

[4] Having reviewed the bases for jurisdiction and venue proposed by the United States, the Court is satisfied that this case is properly before this Court.

[5] JV Imports LLC is absent from the cast of characters set forth in paragraph 41 of Agent Phillipi's affidavit. (Docket #104, Exhibit A, ¶ 41). The omission may be intentional or simply an inadvertent ministerial oversight by the United States. Regardless, the Court finds that the complaint adequately alleges a nexus between the defendant properties claimed by JV Imports LLC and the predicate offenses because: (i) certain accused Claimants control this entity; and (ii) JV Imports LLC sells SSCs (defined below) through the same website that serves as the primary web portal for the predicate offenses: WWW.BUY-HERBAL-INCENSE.COM. *See e.g.*, (Docket #104, Exhibit A, ¶¶ 39 and 40).

[6] This subset of predicate violators includes Alec Nicholas Tundidor ("Tundidor"). (Docket #104, Exhibit A, ¶ 41).

intentionally manufacture, distribute and sell, and did intentionally manufacture, distribute and sell, smokeable synthetic cannabinoid products ("SSCs"): (i) that contained, and which they knew to contain, two controlled substance analogues – UR-144 and XLR-11 – of a scheduled controlled substance (JWH-018); and (ii) which they intended for human consumption (such enterprise, collectively, the "Organization"). (Docket #104, Exhibit A, ¶¶ 32-98).[7]

Although the Organization's several participants "have distinct entity names, principals, and accounts at financial institutions," the Organization operates under a single umbrella called "DS APPLICATIONS/SYNERGY BOTANICALS[.]" (*Id.* at ¶¶ 41 and 43). The Organization's SSCs were marketed primarily through a single website: [WWW.BUY-HERBAL-INCENSE.COM](http://www.buy-herbal-incense.com) ("Website") (*Id.*, ¶¶ 32, 36, 37, 39, 43, 54, 55, 57, 59, 73, 98). On May 8, 2012, Agent Phillipi, while operating in an undercover capacity, called the telephone number posted on the Website. (*Id.* at ¶ 55). The telephone call led to an in-person meeting on May 23, 2012, at which time Agent Phillipi "met with and purchased 1,000 pieces of SSC product from TUNDIDOR and his business partner, John WILHOITE, for $5,000" (the "May Order"). (*Id.* at ¶ 55). Once delivered, the May Order was analyzed by the DEA North Central Lab and "found to contain the synthetic cannabinoids UR-144 and XLR-11[.]" (*Id.* at ¶ 63).

Prior to that controlled buy, on February 1, 2012, DEA Milwaukee agents and Milwaukee Police officers seized 27,315 SSC units that contained

---

[7] Claimants' first proposed ground for dismissal focuses on only a subset of this alleged scheme: *mens rea*. In other words, Claimants challenge only whether they conducted themselves with the requisite criminally culpable mental state. Therefore, this summary of facts is limited accordingly.

AM2201 (presently scheduled as a controlled substance within the meaning of 21 U.S.C. § 841) and "that had a total weight of approximately 54,059 grams, or about 119 pounds, and a retail value of approximately $368,886." (*Id.* at ¶¶ 50-54). The majority of these goods carried one of the Organization's brand names and had the Website "printed on the back of the product packaging." (*Id.* at ¶ 54). The first stage of this seizure occurred at three Milwaukee area retail convenience stores (whereas the second stage occurred at the local wholesaler) and, at these retail locations, SSCs were "available for sale, but not publicly displayed despite being the most profitable item sold." (*Id.* at ¶ 50).[8]

The invoice for a subsequent controlled buy, initiated on July 10, 2012, refers to packets containing 1-gram, 2-gram and 4-gram quantities of SSCs. (*Id.* at ¶¶ 60-61). In general, sales of SSCs at weights in this range "are more consistent with drug weights for human consumption than with that of legitimate 'potpourri,' 'incense,' 'BOTANICALS sachets,' and 'air fresheners,' as these products are purportedly marketed and labeled." (*Id.* at ¶ 81). Moreover, in general, "the prices charged for SSC[s] are more in line with drug prices than with those of legitimate products." (*Id.*).

### 2.2.2 John Wilhoite

According to a former importer and distributor of synthetic cannabinoid compounds, in the course of his/her[9] dealings with Purity

---

[8] The United States submits that, in general, this clandestine manner of sale is a tactic to avoid selling SSCs "to a confidential informant or an undercover law enforcement officer." (*Id.* at ¶ 31(h)).

[9] Agent Phillipi's affidavit uses gender-neutral phrases to refer to this individual. As the individual is cooperating with the United States – "against his/her own penal interests," – this gender-masking is designed presumably to protect the cooperator's identity. *See, e.g.*, (Docket #104, Exhibit A, ¶¶ 87-88).

Brokers – one of the Claimants (and one of the predicate violators) – he/she purchased synthetic cannabinoid compound and "John WILHOITE would have to sign off on any deals regarding prices charged." (Docket #104, Exhibit A, ¶¶ 87-88).

In addition to serving this gating function for the Organization (as Purity Brokers is a constituent entity of the Organization), John Wilhoite kept detailed notes of his research on SSCs that reveal, *inter alia*, the following: (i) "[i]n notes dated February 24, 2012, WILHOITE wrote: '<u>Brett</u> Someone in Kansas was prosecuted under the Analog Act'" (*Id.* at ¶ 82(L)); (ii) "just three days before JWH-018 and four other cannabinoids became emergency scheduled [as illicit controlled substances], WILHOITE wrote:…'Masking agents through several nitriles. New compounds can't test what they're not looking for'" (*Id.* at ¶ 82(G)); and (iii) "in notes dated around September 2011, he wrote: 'AM-2233 for potency. AM-2322 for smoothness.'" (*Id.* at ¶ 82(N)).

Notably, in a conversation on May 23, 2012, John Wilhoite acknowledged to Agent Phillipi (who was operating in an undercover capacity) "that people are not supposed to smoke potpourri or incense but they do." (*Id.* at ¶ 80).

3. Analysis

    3.1    Ground One:  Are the factual allegations regarding *mens rea* adequate?

Claimants assert that the United States' complaint fails to state a claim upon which relief can be granted because the factual allegations regarding *mens rea* are inadequate. *See* (Docket #s 111, 120, 121 and 122).

In general, to state a cognizable claim under the federal notice pleading system, the plaintiff is required to provide a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.

R. Civ. P. 8(a)(2). The plaintiff's statement need only "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, a complaint that offers "labels and conclusions" or "formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). In other words, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The complaint allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

In considering whether a complaint states a claim, courts should follow the principles set forth in *Twombly* by first, "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Legal conclusions must be supported by factual allegations. *Id.* If there are well-pleaded factual allegations, the court must, second, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

Here, the United States brings a civil forfeiture action *in rem* under a federal statute and so Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions applies.[10] Rule G(2)(f) provides

---

[10] Under Rule G(1), the Federal Rules of Civil Procedure, *inter alia*, apply to the extent that Rule G does not address an issue.

Page 8 of 16

Case 2:12-cv-01183-JPS   Filed 07/12/13   Page 8 of 16   Document 130

that the complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." To meet its burden of proof at trial, the United States must "establish, by a preponderance of the evidence, that the property is subject to forfeiture[.]" 18 U.S.C. §983(c)(1).[11]

Therefore, the question before the Court is whether the United States' complaint states sufficiently detailed facts to support a reasonable belief that the government will be able to establish at trial, by a preponderance of the evidence, that the defendant properties are proceeds traceable to knowing and intentional exchange(s) for controlled substances, analogs thereof, or both.[12]

---

[11] "Civil forfeiture is an in rem proceeding. The Property is the defendant in the case…" and therefore the relevant question is whether "the property was involved in a violation to which forfeiture attaches." *U.S. v. Sandini* 816 F.2d 872 (3rd Cir. 1987).

[12] As noted *supra* in Section 1, the United States alleges that the defendant properties constitute, *inter alia,* proceeds traceable to knowing and intentional exchange(s) for controlled substances, analogs thereof, or both, all in violation of 21 U.S.C. §§ 841(a)(1), 813 and 802(32), and therefore are subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6). (Docket #104, ¶¶ 5 and 19).

As noted *supra* in the second footnote, this theory appears to account for thirty-four of the thirty-five defendant properties; as to the remaining property – one 2005 Infiniti FX35 – the United States alleges that it was used to facilitate the knowing and intentional transportation or concealment of materials intended for use in the knowing and intentional trafficking of controlled substances, analogs thereof, or both, all in violation of 21 U.S.C. §§ 841(a)(1), 813 and 802(32), and therefore is subject to forfeiture to the United States under 21 U.S.C. § 881(a)(4). *See* (Docket #104, ¶¶ 5 and 20) and (Docket #104, Exhibit A, ¶¶ 67-69).

Because Claimants' first proposed ground focuses on a common denominator among the thirty-five properties – whether the intentional trafficking was also done *knowingly* – the Court need not (and will not) distinguish further this thirty-fifth property in the analysis that follows.

To establish that a substance is a "controlled substance analogue" within the meaning of the Controlled Substances Analogue Enforcement Act ("Analogue Act"), the United States must prove two criteria: (1) the substance's chemical structure "is substantially similar" to that of a controlled substance ("Criterion One"); and (2) the substance's physiological effect on the central nervous system ("Criterion Two"): (a) "is substantially similar to or greater than" that of a controlled substance; *or*, (b) is represented or intended to have such an effect. 21 U.S.C. § 802(32)(A); *United States v. Turcotte*, 405 F.3d 515, 524 (7th Cir. 2005) ("serv[ing] notice that courts in this circuit should henceforth apply a conjunctive reading of the CSA's Analogue Provision").

> In addition, the Analogue Act imposes a scienter requirement:
>
> [T]he defendant must know that the substance at issue meets the definition of a controlled substance analogue set forth in § 802(32)(A): A defendant must know that the substance at issue has a chemical structure substantially similar to that of a controlled substance, and he or she must either know that it has similar physiological effects or intend or represent that it has such effects. We recognize that requiring the government to prove scienter as to these criteria may impose a significant prosecutorial burden in some cases. The question of similar chemical structure is particularly nettlesome since, even if such chemical similarities exist, and even if the defendant is aware of these similarities, the intricacies of chemical science may render it extremely difficult to prove that a defendant had such knowledge. As a provisional remedy for this problem, we prescribe that, in such cases, if the scienter requirement is met with regard to the second part of the analogue definition (knowledge or representation of similar physiological effects), the jury is permitted–but not required–to infer that the defendant also had knowledge of the relevant chemical similarities.

*Turcotte*, 405 F.3d at 527.

Here, Claimants argue that the facts alleged in the United States' complaint do not provide the Court an adequate basis to support a reasonable belief that the government will be able to meet its burden of proof at trial as to the scienter requirement.

In light of the teachings of *Turcotte*, the Court turns to allegations in the complaint relevant to Criterion Two (knowledge of similar physiological effects). In the Court's view, the factual allegations set forth above in Section 2.2.1, when viewed together with the balance of the facts alleged in the United States' complaint, amply paint a picture of the Organization distributing (in exchange for proceeds) substances Claimants both: (i) intended for human consumption; and (ii) knew have physiological effects similar to that of a controlled substance.

In particular, the Court observes that the Organization turned factors of production – here, damiana leaves laced with certain chemicals – into outputs marketed in quantities (*e.g.*, 1-gram, 2-grams, etc.) which one could reasonably infer are designed to signal to consumers that the outputs are substitutes for controlled substances intended for human consumption. In addition, the sheer volume of proceeds the Organization appears to have netted from its enterprise, taken together with allegations of supracompetitive pricing,[13] permit the reasonable inference that consumers in fact viewed the outputs as substitutes for controlled substances and so, concomitantly, viewed the physiological effects as similar to that of a controlled substance. More importantly, one can reasonably infer that the

---

[13] One logical explanation for supracompetitive pricing– prices above those which can be sustained in a competitive market – is that the outputs are not, in fact, what they are *nominally* marketed to be (*e.g.*, incense, botanical sachets and car fresheners). Moreover, the United States' factual allegations are sufficiently detailed and salient so as to permit the inferences which follow this footnote.

Organization's supracompetitive profits, when divvied up among its constituent elements (*e.g.*, Claimants), signaled to each Claimant that the outputs' physiological effects are similar to that of a controlled substance. From this, Claimants' several knowledge of the relevant chemicals' similarities is a permissible inference. *Turcotte*, 405 F.3d at 527. Therefore, the Court finds that the United States' complaint states sufficiently detailed facts to support a reasonable belief that the government will be able to establish at trial, by a preponderance of the evidence, that the Organization knowingly and intentionally trafficked in one or more controlled substances analogs that were exchanged for proceeds ("Proceeds").[14]

Therefore, the Court is obliged to and will deny Claimants' motions to dismiss on this ground.

Although the Court stands on the analysis set forth *supra*, an alternative analysis to support a predicate offense to which the Proceeds can be traced is available: John Wilhoite's notes permit inferences not only that he intended the Organization's outputs for human consumption (*e.g.*, his notes on smoothness and potency bespeak mindfulness as to the criteria by which smokeable products are commonly evaluated), but also that he knew he was orchestrating the manufacture and distribution of outputs with physiological effects similar to a controlled substance (*e.g.*, his notes on someone being prosecuted under the Analog Act and his notes remarking that "[n]ew compounds can't test what they're not looking for"). Therefore, the Court also finds that the United States' complaint states sufficiently detailed facts to support a reasonable belief that the government will be able

---

[14] The next section of the analysis will address whether the United States' complaint adequately alleges the nexus between the Proceeds and the defendant properties.

to establish at trial, by a preponderance of the evidence, that at least John Wilhoite had the requisite *mens rea* with regard to his part in the Organization's distribution of one or more controlled substances analogs that were exchanged for Proceeds. In this connection, the Court finds that John Wilhoite's alleged control over the Organization's pricing[15] permits the inference that the Organization's Proceeds are all tainted by his *mens rea*.[16]

3.2     Ground Two: Are the factual allegations of nexus adequate?

The United States claims that the defendant properties constitute, *inter alia,* proceeds traceable to knowing and intentional exchange(s) for controlled substances, analogs thereof, or both, all in violation of 21 U.S.C. §§ 841(a)(1), 813 and 802(32), and therefore are subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6). (Docket #104, ¶¶ 5 and 19).

In alleging traceability of the defendant properties to the predicate violation analyzed in *supra* in Section 3.1, the United States' complaint alleges, *inter alia*: (i) that none of the Organization's proceeds derive from legitimate sources of revenue,[17] *see* (Docket #104, Exhibit A, ¶¶ 43 and 49); (ii) claimants John Wilhoite, Amy Wilhoite, Tundidor, Hong Yong Zou and Yi Zhou have reported income (each under $48,245 per year and most far

---

[15] As noted *supra* in Section 2.2.2, according to a former importer and distributor of synthetic cannabinoid compounds, in the course of his/her dealings with Purity Brokers – one of the Claimants, a member of the Organization, and one of the predicate violators – he/she purchased synthetic cannabinoid compound and "John WILHOITE would have to sign off on any deals regarding prices charged." (Docket #104, Exhibit A, ¶¶ 87-88).

[16] Again, it bears repeating that Claimants do not appear to contest that the Organization engaged in an enterprise where it exchanged its outputs for proceeds. Rather, Claimants focus on the mental state with which they conducted themselves.

[17] As noted above, the Organization includes, *inter alia*, each of the several entities which have submitted claims in this action.

beneath that amount) to the United States Internal Revenue Service in recent years (*Id.* at ¶¶ 104-107) far beneath the value of the respective defendant properties in which these Claimants assert interests;[18] (iii) and myriad factual details establishing at least one nexus between the Organization (including one or more of its several members) and each of the defendant properties (*Id* at ¶¶ 109-269).

Viewing these allegations, together with the remainder of the allegations in the United States' complaint, the Court finds that the complaint alleges sufficiently detailed facts to support a reasonable belief that the government will be able to establish at trial, by a preponderance of the evidence, that the defendant properties are subject to forfeiture as proceeds traceable to (at least) knowing and intentional exchange(s) for controlled

---

[18] The remaining natural persons who have submitted claims – Christopher Brett Hinton and Jia Zou – seek (with one exception) exclusively money seized from East West Bank accounts. (Docket #104, ¶¶ 10 and 13). The East West Bank accounts seized are each held in the name of a claimant entity (in contrast to natural persons). (*Id.* at Exhibit A, ¶ 130).

As for the one exception: Jia Zou also claims $65,027.00 in United States currency, (Docket #104, ¶ 13a), however that particular amount of currency was seized from the bedroom of Hong Yong Zou and Yi Zhou (*Id.* at ¶ 120). Jia Zou may claim this amount nevertheless, but his claim is contextualized by the fact that it was seized from the bedroom of two individuals for whom reported income "had not exceeded $12,000 a year to date." (*Id.* at ¶ 107).

substances, analogs thereof, or both, all in violation of 21 U.S.C. §§ 841(a)(1), 813 and 802(32).[19] [20]

Therefore, the Court is obliged to and will deny Claimants' motions to dismiss on this ground.

3.3 Ground Three: Vagueness as applied?

Claimants' vagueness challenge to the Analogue Act as applied to chemicals UR-144 and XLR-11 (those at issue in at least some of the Organization's output), when distilled to its essence, reveals only countervailing evidence regarding the issues of similarity of chemical structure and similarity of physiological effect on the central nervous system (Criterion One and Criterion Two, respectively, addressed *supra* in Section 3.1). Such evidence, extrinsic to the complaint, is not a proper subject of a motion to dismiss a civil forfeiture complaint because it challenges the sufficiency of *the evidence* underlying the allegations in the complaint rather than the sufficiency of *the allegations in the complaint themselves. See* Rule G(8)(b)(i) of Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

---

[19] The Court is mindful that, in civil forfeiture proceedings generally, "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D).

[20] The Court acknowledges Claimants' motions, in the alternative, for a more definite statement as to the connection between the defendant properties and predicate violation(s). For the reasons set forth above, these motions will be denied as well.

Therefore, the Court is obliged to and will deny Claimants' motions to dismiss on this ground.[21]

Accordingly,

IT IS ORDERED that Claimants' motions to dismiss (Docket #s 111, 120, 121 and 122) be and the same are hereby DENIED; and

IT IS FURTHER ORDERED that claimants 6 Degrees Marketing Group LLC, Synergy Botanicals Co LLC, Amy Wilhoite and John Wilhoite's "Motion for Reconsideration" (Docket #109) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 11th day of July, 2013

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

---

[21] The Court acknowledges the outstanding motion for reconsideration of the stay in this case. (Docket #109). At bottom, that motion requests an end of the stay with a view to holding a hearing on Claimants' as-applied challenge. In light of the Court's disposition of that ground in this order, the Court will likewise deny the motion to lift the stay.